IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| ROBERT J., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | 1:25CV997 |
| | ) | |
| FRANK BISIGNANO,<br>Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER AND MEMORANDUM OPINION OF UNITED STATES MAGISTRATE JUDGE**

The plaintiff, Robert J. ("Robert"), has sought review of a final decision of the Commissioner of Social Security denying his claim for disability insurance benefits, a period of disability, and supplemental security income.[1] The Court has considered the certified administrative record and dispositive briefs from each party. Because substantial evidence supports the determination of the Administrative Law Judge ("ALJ"), the Court will deny Robert's request for the award of benefits or for a remand, as set forth below.

I. PROCEDURAL HISTORY

In 2022, Robert filed an application for disability insurance benefits, a period of disability, and supplemental security income alleging a disability onset date of September 30, 2021. (Tr. 228-240.) The application was denied initially and upon reconsideration. (Tr. 123-32, 141-48.) After a hearing, the ALJ determined on October 29, 2024 that Robert was not disabled under the Act. (Tr. 29-80.) The Appeals Council denied a request for review, making the ALJ's decision the final decision for the purposes of judicial review. (Tr. 1-7.)

II. STANDARD OF REVIEW

While Section 405(g) of Title 42 of the United States Code "authorizes judicial review of the Social Security Commissioner's denial of social

[1] Transcript citations refer to the Administrative Transcript of Record filed manually with the Commissioner's Answer. *See* Docket Entry 5. By Order of Reference, this matter was referred to the Undersigned to conduct all proceedings in this case pursuant to 28 U.S.C. § 636(c). *See* Docket Entry 13.

security benefits," *see Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006), the scope of that review is specific and narrow, *see Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986). Specifically, review is limited to determining if there is substantial evidence in the record to support the Commissioner's decision. 42 U.S.C. § 405(g); *Hunter v. Sullivan*, 993 F.2d 31, 34 (4th Cir. 1992); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In reviewing for substantial evidence, the Court does not reweigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Put simply: the issue before the Court is not whether Robert is disabled but whether the finding that he is not disabled is supported by substantial evidence and based upon a correct application of the relevant law. *Id.*

III. THE ALJ'S DECISION

The ALJ followed the correct process, set forth in 20 C.F.R. §§ 404.1520, 416.920, to determine disability. *See Albright v. Comm'r of Soc. Sec. Admin.*, 174 F.3d 473, 475 n.2 (4th Cir. 1999).

"The Commissioner uses a five-step process to evaluate disability claims." *Hancock v. Astrue*, 667 F.3d 470, 472-73 (4th Cir. 2012) (citing 20 C.F.R. §§ 416.920(a)(4), 404.1520(a)(4)).

> Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her [or his] past relevant work; and (5) if not, could perform any other work in the national economy.

*Id.* at 472. A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. *Id.* at 473. "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the Secretary to produce evidence that other jobs exist in the national economy that the claimant can perform considering his age, education, and work experience." *Hunter*, 993 F.2d at 35 (internal citations omitted).

Here, the ALJ determined at step one that Robert had not engaged in substantial gainful activity since the alleged onset date of September 30, 2021. (Tr. 31.) The ALJ next found the following severe impairment: "Nocturnal Seizures." (Tr. 32.) At step three, the ALJ found Robert did not have an impairment or combination of impairments listed in, or medically equal to one listed in, Appendix 1. (Tr. 34.) The ALJ next set forth Robert's Residual Functional Capacity ("RFC") and determined he could perform a

full range of work at all exertional levels with the following non-exertional limitations: "the claimant can never climb ladders, ropes, or scaffolds. He can never work at unprotected heights and never operate a motor vehicle, and other seizure precautions as recommended by the claimant's treating physicians." (Tr. 35.) At the fourth step, the ALJ determined that Robert was unable to perform his past relevant work. (Tr. 44.) At step five, the ALJ concluded that there were other jobs that Robert could perform. (Tr. 45-46.)

## IV. DISCUSSION

Robert first contends that "[t]he ALJ erred in failing to consider the overwhelming evidence establishing that [his] impairments satisfied § 11.02A of the Listing impairments or the medical equivalence standard for disability." Docket Entry 10 at 7. That is, Robert argues that his impairment met those of epilepsy or its equivalent, satisfying step three of the ALJ's analysis.

Next, Robert contends that "[t]he ALJ erred in improperly evaluating [his] statements about the intensity, persistence, and limiting effects of his symptoms based upon the ALJ's opinion of [his] credibility." *Id.* at 13. Third, Robert contends that "[t]he ALJ's findings regarding [his] residual functional capacity limitations were not supported by substantial evidence." *Id.* at 17. As set forth below, these objections have no merit.

### A. The ALJ's Step Three Determination.

As noted, Robert first objects that "[t]he ALJ erred in failing to consider the overwhelming evidence establishing that [his] impairments satisfied § 11.02A of the Listing impairments or the medical equivalence standard for disability." Docket Entry 10 at 7. This objection has no merit.

More specifically, the listings are examples of medical conditions that ordinarily prevent a person from any gainful activity. *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990); *see also* 20 C.F.R. §§ 404.1525(a), 416.925(a). A claimant's severe impairment generally "meets" a listing if it "satisfies all of the criteria of that listing, including any relevant criteria in the introduction, and meets the [one-year] duration requirement." 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3); *Zebley*, 493 U.S. at 530 ("For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify."). An impairment or combination of impairments generally medically equals a listing when it is at least equal in severity and duration to the criteria of any listed impairment. 20 C.F.R. §§ 404.1526(a)-(b), 416.926(a)-(b); *Zebley*, 493 U.S. at 531 ("[T]o qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present

medical findings equal in severity to *all* the criteria for the one most similar listed impairment.").

An adult claimant whose severe medically determinable impairment(s) satisfies a listing is presumed disabled regardless of his or her vocational profile. 20 C.F.R. §§ 404.1525(c), 416.925(c). Thus, proving "listing-level severity" requires the claimant to demonstrate a *greater degree* of physical or mental impairment than the baseline statutory standard of being unable to perform "substantial gainful activity." *Zebley*, 493 U.S. at 532. A claimant who can satisfy a listing, however, "is entitled to a conclusive presumption that he [or she] is disabled." *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (citations omitted). Thus, the ALJ generally must identify the relevant listed impairments and "compare[ ] each of the listed criteria" to the medical evidence in the claimant's record. *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986).

Listing 11.02A, the relevant listing here, requires evidence of epilepsy or an equivalent impairment with a detailed description of a typical seizure and evidence of generalized tonic-clonic seizures (*see* 11.00H1a), occurring at least once a month for at least three consecutive months (*see* 11.00H4) despite adherence to prescribed treatment (*see* 11.00C). 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.02A. Tonic-clonic seizures are "seizures . . . characterized by loss of consciousness accompanied by a tonic phase (sudden muscle tensing causing the person to lose postural control) followed by a clonic phase (rapid cycles of muscle contraction and relaxation, also called convulsions)." *Id.* § 11.00H1a. The required number of seizures must occur within the relevant period. *Id.* § 11.00H4.

In addition, Listing 11.00H4 indicates that (a) multiple seizures within a 24-hour period count as one seizure; (b) a continuous series of seizures without return to consciousness between seizures counts as one seizure; (c) a dyscognitive seizure that progresses into a tonic-clonic seizure counts as one seizure; (d) seizures occurring during a period of noncompliance with prescribed treatment do not count without good reason for the noncompliance; and (e) psychogenic nonepileptic seizures or pseudoseizures do not count for Listing 11.02 and are instead considered under Listing 12.00. *Id.*

B. The ALJ's Step Three Determination Was Legally Correct and Well-Supported.

Here, the ALJ found Robert's nocturnal seizures severe, addressed the evidence of record, and gave reasons why Listing 11.02A was not met or equaled. (Tr. 32, 34-44.) In so doing, the ALJ found that Robert failed to establish that he had tonic-clonic seizures that satisfied 11.02A's requirements. (Tr. 34.) The ALJ applied the correct law, explained why Robert failed to meet the listing, and substantial evidence supports his finding.

1. The ALJ considered the origin and manifestation of the impairment.

Specifically, the ALJ discussed Robert's testimony that he was beaten about the face around 2018, and that the beating caused his seizure disorder. (Tr. 35, 63.) Robert attributed a hand tremor, which he alleged prevented him from doing yardwork, and his symptoms of depression and memory loss and difficulty focusing, to the beating. (Tr. 69-70, 133, 316, 322.) Robert testified that in 2021, he had a "very major seizure" and continued to have "around two" or "two to three" seizures a month but sometimes, they occurred in clusters of two in one week. (Tr. 67.) He described aftereffects such as a severe headache, needing to sleep all day, feeling like he had been hit by a truck when he woke up, joint dislocations, and shaky legs. (Tr. 67-69.) Robert testified that he had experienced seizures at this severity and frequency since September 2021. (Tr. 68.)

The ALJ discussed the longitudinal medical record, going back to before the relevant period (September 30, 2021 through October 29, 2024) began when Robert saw neurologist William Dawson, M.D., in August 2016. (Tr. 38, 678.) Robert reported being kicked in the head at least ten times without losing consciousness at age 18 (about 1998) and that in 2007, he also sustained head trauma without loss of consciousness. (Tr. 38, 678.) After the 2007 incident, his seizures increased to occurring monthly and in 2011, he started taking Dilantin and had been seizure free ever since. (Tr. 38, 678.) The ALJ also acknowledged the following notes Dr. Dawson made: "Eyewitnesses are not available, but they tell him that he 'makes noises,' raises both arms, at times flexes both arms. He has on occasion dislocated his arms if the seizure occurs while he is prone. He has experienced tongue biting frequently and urinary incontinence at least once." (Tr. 38, 678.)

The ALJ discussed Robert's complete physical exam in April 2021, around five months before the September 30, 2021 onset date. (Tr. 38.) He reported doing well with no major issues or problems, and that he had taken zonisamide regularly since 2011 to prevent partial seizures. (Tr. 38, 607.) The ALJ noted that in August 2021, Robert reported a breakthrough seizure during sleep. (Tr. 38, 695.) Robert endorsed being sore and lethargic for the following two days and unable to go to work and denied biting his tongue or experiencing incontinence. (Tr. 38, 695.)

At a neurology follow-up in March 2022, Robert said he had reduced his prescribed dose of zonisamide on his own a few months earlier due to excessive lethargy. (Tr. 39, 697.) He reported having approximately three seizures over the past three months, the last one occurring about two weeks earlier, all occurring in his sleep (Tr. 39, 697.) Dr. Dawson recommended trying another medication, tapering off zonisamide, and returning in six months. (Tr. 39, 698.)

The ALJ also discussed that on July 12, 2022, Robert presented at the emergency department complaining of tailbone pain after falling out of bed while sleeping on July 2, 2022. (Tr. 37, 612.) He did not recall a seizure and said he had a very hazy memory of falling out of bed and landing on his buttocks. (Tr. 37, 612.)

The ALJ considered that Robert saw Dr. Dawson in October 2022 and reported being compliant with levetiracetam and having ongoing nocturnal seizures approximately twice per month. (Tr. 39, 703.) Dr. Dawson offered a referral to an epilepsy clinic, increased the dose of levetiracetam, and recommended Robert keep track of his seizures on a calendar and return in six months. (Tr. 39, 704.)

2. The ALJ noted that Robert did not complain of symptoms of the impairment during other medical appointments in 2023 and 2024.

As the ALJ pointed out, Robert did not return to the neurologist until May 2024, but he saw primary care physician David Christopherson, M.D. during the nineteen-month interim. (Tr. 39, 772, 825.) In April 2023, Robert complained to Dr. Christopherson about left knee and calf pain but did not mention hand tremors or seizures, recent or otherwise. (Tr. 39, 40, 772, 825.) He had a normal physical exam. (Tr. 39, 772, 825.)

The ALJ discussed other interim medical visits—at which, notably, Robert did not report recent seizures or hand tremors. (Tr. 39-40.) For example, Robert went to an orthopedic practice in May 2023 with complaints of hamstring pain after his left knee "gave out" going up steps. (Tr. 40, 774.) The ALJ noted that, as he had in the past, Robert did not seek medical attention until about a week after the injury, so there were no signs of bruising and/or erythema. (Tr. 40.) The ALJ discussed the normal findings. (Tr. 40, 775-76.)

Robert did not exhibit knee pain on exam and had normal motor function of the bilateral lower extremities, with no sign of lymphadenopathy of the left knee, which was also negative for crepitus or varus/valgus instability. (Tr. 40, 775.) Robert's left hip showed no pain on range of motion, both knees had normal patella track signs, and Robert had 5/5 quad strength. (Tr. 40, 775.) Knee imaging revealed normal joint spaces, no soft tissue swelling, no fractures, preserved patellofemoral joint spaces, and no patellofemoral malignment. (Tr. 40, 776.) Robert was diagnosed with left hamstring strain and left quadricep weakness. (Tr. 40, 776.)

The ALJ considered that about nineteen months had elapsed between when Dr. Dawson told Robert to track his seizures for possible follow-up with an epilepsy clinic and the time he returned in May 2024. (Tr. 39-40, 704, 825.) Robert saw even more providers during that gap. For example, the ALJ noted that Robert went to physical therapy ("PT") for his hamstring strain

and had an eye exam. (Tr. 40, 779-99, 820-21, 825.) At PT on June 29, 2023, Robert reported having a seizure about a week before (Tr. 796); otherwise, he did not mention seizures during this gap in seeing Dr. Dawson.

The ALJ also discussed Robert's August 2023 visit with his primary care physician for right flank pain that had persisted for five days. (Tr. 40, 801.) Robert made no mention of continued seizures or tremors and had a normal physical exam. (Tr. 40, 801.) Although Robert saw other providers during the nineteen-month gap during which he did not return to Dr. Dawson, he told Dr. Dawson that a lapse in insurance coverage had prevented him from returning until May 14, 2024. (Tr. 40, 825.) Robert endorsed having nocturnal seizures about twice a month despite reported compliance with medication. (Tr. 825.) He said some seizures caused muscle soreness in the legs and excessive sedation that affected his ability to work. (Tr. 825.) Robert reported falling out of bed "last summer" and resulting back pain. (Tr. 825.) Robert also endorsed hand tremors over the past year. (Tr. 825.) On exam, Robert had normal attention, memory, and gait. (Tr. 826.) Robert said he would track his seizures on a calendar, Dr. Dawson adjusted Robert's medications and recommended a referral to an epilepsy clinic, and Robert declined medication for his hand tremors. (Tr. 41, 826.)

3. The ALJ noted that Robert's impairment manifested at night.

The ALJ also discussed normal brain imaging in June 2024 and Dr. Dawson's normal findings the following month. (Tr. 41, 828-29, 857.) In July 2024, Robert reported the frequency of his nocturnal seizures remained the same, about two a month. (Tr. 41, 825, 857.) He also claimed to have two to four "major seizures" annually. (Tr. 41, 857.) Robert said he had a "severe seizure" about three weeks earlier, which resulted in a weeklong absence from work. (Tr. 41, 857.) But the ALJ noted that Robert did not go to the emergency room at the time of, or even shortly after, the reported seizures. (Tr. 40.) Robert claimed all of his seizures, major and minor, occurred at night during sleep, and he often woke up feeling tired with bite marks on the inside of his cheek, which led him to believe he may have had a seizure. (Tr. 41, 857.) He also experienced bedwetting once or twice a year and said he was compliant with medication. (Tr. 41, 857.) Robert reported managing his hand tremors with "mild yoga." (Tr. 857.) Dr. Dawson found Robert had normal attention, memory, and heel-to-toe walking, and referred him to an epilepsy specialist. (Tr. 41, 859.) As the ALJ noted, Robert again declined medication to address the hand tremors. (Tr. 41, 859.) *See Dunn v. Colvin*, 607 F. App'x 264, 275 (4th Cir. 2015) (unpublished) ("[W]hen a claimant complains that her alleged disability is so bad that she is unable to work," and the ALJ finds her treatment was not as aggressive as one would reasonably think given the allegations, then it is reasonable for the ALJ to find

that bears on the claimant's credibility.).

4. The ALJ detailed the support for his finding that Robert's impairment was not as or more severe than epilepsy and similar seizure-based ailments.

Here, the ALJ set forth ample support for his Listing 11.02A finding. As an initial matter, there was no detailed description of Robert's typical seizure because his seizures occurred during sleep with no eyewitnesses, and he did not seek medical attention for any resulting injuries such as dislocating his shoulder or from biting his tongue or cheek. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.02 (listing introduction stating that the condition must be "documented by a detailed description of a typical seizure").

Regarding 11.02A's requirement that the seizures must occur at least once a month for at least three consecutive months "despite adherence to prescribed treatment," in March 2022, Robert acknowledged that he reduced his prescribed dose of zonisamide on his own a few months earlier due to excessive lethargy. (Tr. 39, 697.) Therefore, for several months at least, Robert did not adhere to prescribed treatment.

As demonstrated above, the ALJ also pointed to Robert's nineteen-month gap between neurology visits. (Tr. 39-40, 704, 825.) This gap in treatment also supported the ALJ's Listing 11.02A analysis.

Robert's alleged onset date was September 30, 2021. (Tr. 228-29.) Regarding 11.02A's requirement that the seizures must occur at least once a month for at least three consecutive months, the ALJ considered Robert's reporting. He made the following reports: (1) he testified to having two to three seizures a month, some that occurred in clusters of two in one week (Tr. 67, 68); (2) in March 2022, he reported having approximately three seizures over the past three months, the last one occurring about two weeks earlier, but this was when Robert was noncompliant with the prescribed dosage (Tr. 39, 697); (3) in October 2022, he reported approximately two seizures per month (Tr. 39, 703); (4) on June 29, 2023, Robert reported having a seizure about a week earlier (Tr. 796); and (5) in May and July 2024, he endorsed ongoing nocturnal seizures about twice a month (Tr. 40-41, 825, 857.) However, as indicated above and detailed in Part C below in response to Robert's second argument, the ALJ properly found Robert's subjective allegations at odds with other evidence. (Tr. 35; *see also* Part C below.)

The ALJ set forth additional support for his Listing 11.02A finding. First, in October 2022 and August 2024, Dr. Dawson opined Robert's nocturnal seizures are "characterized by loss of consciousness accompanied by a tonic phase (sudden muscle tensing causing the person to lose postural control) followed by a clonic phase (rapid cycles of muscle contraction and relaxation, also called convulsions)." (Tr. 707, 714,

835, 846.) 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.00H1a. Yet, as the ALJ pointed out (and Dr. Dawson acknowledged), there were no eyewitnesses. (Tr. 36, 42, 43, 568, 579, 678.)

Second, the ALJ also noted that the evidence did not show Robert sought medical attention for the head traumas that supposedly touched off the seizures. (Tr. 42.) Third, the ALJ pointed out that Dr. Dawson's opinion, including its reference to supposed frequency of Robert's nocturnal seizures, relied entirely on Robert's subjective reporting, which the ALJ found inconsistent with the evidence. (Tr. 35-36, 42; *see also* Part C below.)

Fourth, the ALJ also considered that there were no records showing medically determinable signs of the seizures on post-seizure presentation, 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.00H1a (defining "tonic-clonic seizures" as being accompanied by a tonic phase followed by a clonic phase—*i.e.*, convulsions), on which the diagnosis of nocturnal seizures was based (Tr. 42-43.) And when he rejected Dr. Dawson's opinion that Robert met Listing 11.02A, the ALJ explained that testing did not support signs of epilepsy, nocturnal, or other seizure disorders; rather, Robert's brain imaging was normal. (Tr. 43.) All these reasons support the ALJ's decision that Listing 11.02A was not met.

5. Robert's objections to the ALJ's Step Three analysis fail.

Robert objects, asserting that seizure activity is not always visible with medical imaging, Docket Entry 10 at 10. The ALJ did not, however, make his listing finding based solely on normal brain imaging. He gave multiple reasons supported by substantial evidence (that this Court has set forth above and below) for finding Robert failed to meet Listing 11.02A.

Dr. Dawson also opined that Robert had a marked limitation in physical functioning, and in October 2022, that Robert would miss more than three days of work a month due to related symptoms, and in August 2024, that Robert's absences would occur one to two times a month. (Tr. 707, 835.) Robert does not argue that he met Listing 11.02D, but the ALJ also rejected the opinion that he had a marked limitation in physical functioning. (Tr. 43, 707, 835.) 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.02D (requiring a marked limitation in at least one area, including physical functioning). The ALJ explained that Dr. Dawson's opinion lacked support because the medical evidence showed Robert, only 41 years old on his alleged onset date, repeatedly had normal coordination, gait, and musculoskeletal exams. (Tr. 43.) Based on the foregoing, the ALJ found Dr. Dawson's opinions not persuasive. (Tr. 43.) Despite Robert's objection to the contrary, the ALJ's evaluation comports with 20 C.F.R. §§ 404.1520c and 416.920c and was supported by substantial evidence.

Robert faults the ALJ for pointing out that he did not present at the hospital

near the times he reported having seizures, even major ones, because Listing 11.02 does not require that. Docket Entry 10 at 10-11. Citing out of district and unpublished caselaw, Robert also faults the ALJ for noting that there were no eyewitnesses to the seizures because the listing does not require such a showing. *Id.* at 11-12 (citing *Dodd v. Kijakazi*, No. 4:22-CV 00005-RN, at *18-19 (E.D.N.C. Jan. 5, 2023)).[2] However, the Listing 11.02 introduction requires evidence of epilepsy or an equivalent impairment with a detailed description of a typical seizure. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.02. In addition, Robert's arguments misapprehend how the ALJ assesses a claimant's RFC and evaluates a claimant's subjective allegations—in other words, how the ALJ makes a disability determination. The ALJ considers all relevant evidence, including treatment sought, in making a disability determination. *See* 20 C.F.R. §§ 404.1529, 404.1545(a)(3), 416.929, and 416.945(a)(3).

Additionally, Fourth Circuit precedent recognizes that when an ALJ finds a claimant's treatment was not aggressive commensurate with his allegations, then the ALJ may reasonably find that this bears on the claimant's reporting. *See Dunn*, 607 F. App'x at 275. Relevant precedent also notes that when a medical opinion is based on subjective reporting inconsistent with the substantial evidence, the ALJ may reasonably reject the opinion. *See, e.g., Craig*, 76 F.3d at 590 n.2 ("There is nothing objective about a doctor saying, without more, 'I observed my patient telling me she was in pain.'"); *Laquita M. R. v. Bisignano*, No. 1:24CV604, 2025 WL 2689043, at *12 (M.D.N.C. Sept. 19, 2025) (finding ALJ did not err in discounting an opinion in part because it over-relied on claimant's subjective complaints) (collecting cases); *Lockard v. Berryhill*, No. 1:17CV358, 2018 WL 4565992, at *4 (M.D.N.C. June 8, 2018) (upholding giving an opinion little weight, in part, because it was based heavily on subjective complaints).

Robert makes conclusory references to the ALJ finding several of his impairments non-severe and the combined effect of his impairments. *See* Docket Entry 10 at 12. This is insufficient to raise a claim on appeal. *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) (a party forfeits an argument "by failing to develop [its] argument—even if [its] brief takes a passing shot at the issue") (cleaned up). As the Fourth Circuit has explained, courts "are not like pigs, hunting for truffles buried in briefs." *Hensley on behalf of N.C. v. Price*, 876 F.3d 573, 581 n.5 (4th Cir. 2017). It is not the job of the Court to wade through the record and develop Robert's arguments for him, and these

[2] Assuming *arguendo* that Dr. Dawson's notes (Tr. 678) were sufficient to meet the threshold requirement of a detailed description of Robert's seizures, Robert would still fail to meet Listing 11.02A for all of the additional reasons set forth herein.

objections have been forfeited.

And even assuming *arguendo* that these conclusory and undeveloped objections were before the Court, they would fail. There is no material error in the ALJ's assessment of Robert's non-severe impairments, including limitations related to mental health. As the ALJ explained, Robert did not seek mental health treatment, performed extensive activities of daily living, had generally normal mental status reports, and appeared to be engaging in symptom magnification. (Tr. 32-33, 35-36, 43.) *See Anthony v. Kijakazi*, No. 1:22CV562, 2023 WL 4353939, at *7 n.5 (M.D.N.C. May 16, 2023) ("It is well-established that non-severe impairments do not require limitations in the RFC, if (as is the case here for the reasons set forth in this Recommendation) there is substantial evidence and an adequate explanation warranting their omission.").

The ALJ also specifically stated that he considered Robert's combination of impairments and whether they met or equaled Listing 11.02. (Tr. 34.) Robert has failed to point to anything suggesting otherwise and, in fact, the ALJ's decision here was remarkably thorough and particularized in assessing Robert's impairments, separately and combined. *See Prickett v. Comm'r of Soc. Sec. Admin.*, No. CV 9:22-00297-MHC, 2023 WL 10410423, at *4 (D.S.C. Mar. 29, 2023) ("[B]ased on a reading of the decision as a whole, it is clear that the ALJ sufficiently considered Plaintiff's impairments in combination and made sufficiently particularized findings."). For all these reasons, the Court overrules Robert's first objection because substantial evidence supports the ALJ's finding that his nocturnal seizures did not meet or equal Listing 11.02A.

C. The ALJ's Subjective Complaints Determination.

Next, Robert contends that "[t]he ALJ erred in improperly evaluating [his] statements about the intensity, persistence, and limiting effects of his symptoms based upon the ALJ's opinion of [his] credibility." Docket Entry 10 at 13. This objection is also unpersuasive.

"An ALJ assesses the credibility of a claimant's subjective statements about his condition as part of the RFC assessment," *Ladda v. Berryhill*, 749 F. App'x 166, 170 (4th Cir. 2018) (unpublished), using a two-part test: "First, there must be objective medical evidence showing 'the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged,'" *Craig*, 76 F.3d at 594 (citing 20 C.F.R. §§ 416.929(b), 404.1529(b)).

If such an impairment exists, the ALJ must then consider, as the second prong of the test, all available evidence, including the claimant's statements about pain, to determine whether the claimant is disabled. *Id.* at 595-96. In so doing, the ALJ need not credit them if they conflict with

the objective medical evidence or if the underlying impairment could not reasonably be expected to cause the symptoms alleged. *Id*. Where the ALJ has considered the relevant factors, *see* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3), heard the claimant's testimony, and observed their demeanor, the Court will defer to the ALJ's determination regarding subjective complaints. *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Those relevant factors include:

> (i) [Plaintiff's] daily activities;
> (ii) The location, duration, frequency, and intensity of [plaintiff's] pain or other symptoms;
> (iii) Precipitating and aggravating factors;
> (iv) The type, dosage, effectiveness, and side effects of any medication [plaintiff] take[s] or [has] taken to alleviate his pain or other symptoms;
> (v) Treatment, other than medication, [plaintiff] receive[s] or [has] received for relief of his pain or other symptoms;
> (vi) Any measures [plaintiff] use[s] or [has] used to relieve his pain or other symptoms (e.g., lying flat on [her] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
> (vii) Other factors concerning [plaintiff's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

1. The ALJ's subjective complaints analysis is legally correct and well-supported.

Here, the ALJ completed the two-step *Craig* analysis. First, for step one, the ALJ stated that he had carefully considered the evidence and found that Robert's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Tr. 36.) Second, at step two of the *Craig* analysis, the ALJ decided that Robert's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. 36.)

The ALJ then provided a number of reasons for partially discounting Robert's subjective complaints. For example, the ALJ contrasted Robert's claims of memory problems with findings of normal memory. (Tr. 33, 35, 39, 41; *see, e.g.*, Tr. 324, 328, 568, 580, 597, 622, 637, 654, 680, 683, 859.) He also discussed Robert's allegations of musculoskeletal problems, such as shoulder problems and overall problems with reaching, lifting, walking, and sitting (Tr. 36, 64, 328, 410, 435, 697, 866), and noted the evidence that Robert had mostly normal physical findings, (Tr. 36-37, 39, 40; *see* Tr. 534, 565, 578,

614, 620, 648, 680, 683, 696, 739, 775). *See* 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2) (ALJ considers objective evidence in evaluating symptoms).

As referenced above, the ALJ also considered that

(1) a nineteen-month gap elapsed between Robert's neurology visits (Tr. 39-40, 704, 825);
(2) Robert saw other providers during that gap and did not routinely complain about seizures or tremors (Tr. 39-40, 779-99, 801, 820-21);
(3) Robert declined medication for his tremors even though he claimed they prevented him from doing a range of activities (Tr. 41, 69, 857, 859, 826);
(4) Robert consistently failed to seek medical attention near the times of his seizures, including "major" or "severe" ones, that allegedly caused injuries or other accidents that he alleged caused injuries, so there was often no supporting medical documentation (Tr. 40, 41, 42, 774, 796, 857); and
(5) Dr. Dawson told Robert to track his seizures, and Robert said he would but did not (Tr. 39, 41, 704, 826).

The ALJ also noted the inconsistency between Robert's report that he fell out of bed the summer of 2023, suggesting the fall was a result of a seizure, and treatment notes stating that he fell going up steps, not due to seizure activity. (Tr. 40, 774, 825.)[3]

Additionally, the ALJ pointed to evidence that Robert was magnifying his symptoms given the activities of daily living he performed while at the same time "endorsing every possible physical and mental limitation." (Tr. 43 (Robert "was working part-time cleaning at a grocer[y] store; and had reported signs on a 2022 function report of parenting his children, cooking, engaging in household tasks, driving, going places alone, shopping in stores working puzzles, texting and using video chat, going to church"), 322-28.) This evidence undermines Robert's claims. *See* 20 C.F.R. §§ 404.1529(c), 416.929(c) (in evaluating symptoms ALJ considers opinions, treatment sought, frequency of symptoms, and inconsistencies between claimant's statements and other evidence).

The ALJ balanced the evidence and explained why Robert's complaints were not borne out. His insistence that the ALJ should have balanced the evidence differently, *see* Docket Entry 10 at 13-17, does not meaningfully undermine the ALJ's subjective complaints assessment. Robert essentially asks the Court to reweigh the evidence in his favor, which it cannot do, *see Craig*, 76 F.3d at 589.

[3] A year earlier in July 2022, Robert reported falling out of bed and injuring his tailbone. (Tr. 612.)

For all these reasons, this objection fails.

D. The RFC Determination.

Robert next challenges the ALJ's RFC determination by contending that "[t]he ALJ's findings regarding [his RFC] limitations were not supported by substantial evidence." Docket Entry 10 at 17. More specifically, Robert contends that "this RFC fails to consider [his] likelihood of absenteeism or tardiness, as is required by SSR 96-8p." *Id.* at 18. He further contends that "this RFC failed to consider [Robert's] well-established exertional limitations." *Id.* As explained in greater detail below, these objections have no merit.

The RFC measures the most a claimant can do in a work setting despite the physical and mental limitations of his or her impairments and any related symptoms (e.g., pain). *See* 20 C.F.R. §§ 404.1545, 416.945; *see also Dunn*, 607 F. App'x at 272 (claimant's RFC is "[a] medical assessment of what an individual can do in a work setting in spite of the functional limitations and environmental restrictions imposed by all of his or her medically determinable impairment(s)") (internal citation omitted); *Hines v. Barnhart*, 453 F.3d 559, 562 (4th Cir. 2006). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." *Hall v. Harris*, 658 F.2d 260, 265 (4th Cir. 1981).

"Social Security Ruling 96-8p explains that the RFC 'assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).'" *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (internal quotations omitted). An ALJ need not discuss every piece of evidence in making an RFC determination. *See Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014). Yet, the ALJ "must build an accurate and logical bridge from the evidence to [the] conclusion." *Brown v. Commissioner*, 873 F.3d 251, 269 (4th Cir. 2017). "The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . . . Only [then] may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." SSR 96-8p, 1996 WL 374184, at *1.

The Fourth Circuit has held that "meaningful review is frustrated when an ALJ goes straight from listing evidence to stating a conclusion." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019) (explaining that "a proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion"). As noted earlier, the ALJ "must both identify evidence that supports his

conclusion and 'build an accurate and logical bridge from [that] evidence to his conclusion.'" *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (alteration in original) (quoting *Monroe*, 826 F.3d at 189). An ALJ's failure to do so constitutes reversible error. *See Lewis v. Berryhill*, 858 F.3d 858, 868 (4th Cir. 2017). Where an ALJ's "analysis is incomplete and precludes meaningful review," remand is appropriate. *Monroe*, 826 F.3d at 191.

1. The RFC is legally correct and substantial evidence supports it.

Robert contends that "this RFC fails to consider [his] likelihood of absenteeism or tardiness, as is required by SSR 96-8p." Docket Entry 10 at 18. However, the ALJ explained why the record did not support Robert's claims about his seizures and other impairments. (Tr. 35-44.) That explanation (which includes the ALJ's subjective complaints analysis) is supported by substantial evidence as discussed above. This evidence also includes (but is not limited to) Robert's long stretches without seeing a neurologist combined with not seeking medical help near the time of his seizures, supporting the ALJ's conclusion that Robert's seizures were not as frequent as he alleged. Robert has failed to prove he required absenteeism or tardiness limitations in the RFC. Therefore, he cannot establish any error in the ALJ not including them in the RFC.[4]

Next, Robert unpersuasively contends that "this RFC failed to consider his well-established exertional limitations." Docket Entry 10 at 18.

Here, the ALJ found Robert, who was 41 years of age on his onset date, could perform work at all exertional levels because he had mostly normal physical findings with minimal treatment. (Tr. 45, 36-41.) Substantial evidence supports that finding. (Tr. 36-37, 39, 546-57 (10/20/17), 732 (6/1/2018), 412 (10/5/18), 417 (2/11/19, "Normal range of motion, Normal strength, No tenderness, No swelling, No deformity, Normal gait."), 648 (4/9/21, "Normal range of motion. Normal strength."), 534 (7/13/21), 704 (10/5/2022), 756 (3/28/2022, "Normal range of motion, normal strength, no deformity, normal gait"), 758 (3/28/2022, "Normal range of motion, normal strength, no

[4] In making this objection, Robert relies on Dr. Dawson's opinions. Docket Entry 10 at 20 (citing Tr. 707, 835). As explained above, the ALJ gave good reasons for discounting those opinions. Robert also relies on the opinion of the state agency psychological consultant and a non-examining state agency psychological consultant. Docket Entry 10 at 20 citing Tr. 815 and 102. However, the ALJ discounted these opinions, (Tr. 43), and Robert does not challenge the ALJ's decision to find them unpersuasive in whole or in part. Robert's objection is a request for the Court to reweigh the evidence, which it will not do.

deformity, normal gait”), 772 (4/18/2023, “Normal range of motion, Normal strength, tender left calf No swelling, No deformity.”), 801 (8/9/23, “Normal range of motion, Normal strength, No tenderness, No swelling, No deformity.”), 826 (5/14/24), 831 (6/25/2024, “Normal range of motion, Normal strength, No tenderness, No swelling, No deformity.”), 867 (9/4/2024, “Normal range of motion, Normal strength, No tenderness, No swelling, No deformity.”); Tr. 43, 322-28 (extensive daily activities and evidence of symptom magnification).)

Beyond this, even though the ALJ concluded that Robert could perform a full range of work at all exertional levels, he identified three positions at the light exertional level that Robert could perform. (Tr. 45-46.) Thus, even if Robert were limited to only light work, there are jobs in the national economy he could perform. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (“Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.”). Moreover, none of these jobs require more than frequent reaching, further undermining Robert’s objection that his purported exertional limitations have not been accounted for. *See* Inspector, 727.687-062, 1991 WL 679674 (“Reaching: Frequently - Exists from 1/3 to 2/3 of the time”); Linen Grader, 361.687-022, 1991 WL 672993 (same); Marker, 209.587-034, 1991 WL 671802 (same); (*see also* Tr. 86, 104.)

Robert’s RFC arguments to the contrary amount to an invitation for the Court to reweigh the evidence. Docket Entry 10 at 21-23. But where, as here, the ALJ adequately explains the RFC finding, and that finding is supported by substantial evidence, the Court will affirm.

E. The ALJ’s Step Five Determination.

Last, Robert contends that “[t]he ALJ’s Hypothetical to the Vocational Expert did not Include All Relevant Limitations.” Docket Entry 10 at 18. As explained below, this objection is unpersuasive.[5]

In questioning a vocational expert (“VE”) in a Social Security disability hearing, an ALJ must propound hypothetical questions that account for all of the claimant’s limitations. *Walker v. Bowen*, 889 F.2d 47, 50-51 (4th Cir. 1989). The claimant bears the initial burden of proving the existence of a disability. 42 U.S.C. § 423(d)(5); 20 C.F.R. §§ 404.1512, 416.912; *Smith v. Califano*, 592 F.2d 1235, 1236 (4th Cir. 1979). Once the claimant has established at step four that she cannot do any work she has done in the past because of her severe

[5] Although Robert couches this objection as the first of his challenges to the ALJ’s RFC determination, Docket Entry 10 at 18, it implicates the ALJ’s step five finding. The Court has consequently addressed this objection last to track the sequential evaluation process.

impairments, the burden shifts to the Commissioner at step five to show that jobs exist in significant numbers in the national economy which the claimant could perform consistent with her RFC, age, education and past work experience. *Hunter*, 993 F.2d at 35; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980). An ALJ may, and frequently does, rely on the testimony of a VE in satisfying this burden. *See* 20 C.F.R. §§ 404.1566(e), 416.966(e); *Hammond v. Apfel*, 5 F. App'x 101, 105 (4th Cir. 2001) (unpublished). In order for a VE's opinion to be relevant, it must be in response to a proper hypothetical question that fairly sets out all of the claimant's impairments. *Walker*, 889 F.2d at 50–51; *see also Mickles v. Shalala*, 29 F.3d 918, 929 n.7 (4th Cir. 1994) (concluding that the hypothetical presented to the VE need only include the impairments and limitations that the ALJ finds credible); *Fisher v. Barnhart*, 181 F. App'x 359, 365 (4th Cir. 2006) (unpublished) (hypothetical question is unimpeachable if it reflects an RFC for which the ALJ had sufficient evidence).

Here, Robert asserts that a remand is in order because of a variance in the hypothetical question the ALJ posed to the VE and the RFC he ultimately adopted. Docket Entry 10 at 18-19. More specifically, the ALJ asked the VE to

> Assume a hypothetical individual of the Claimant's age and education and with the past work described. Further assume that this individual is limited to the following . . . non exertional limitations only. This individual shall never climb ladders, ropes or scaffolds. Shall not work at unprotected heights. Shall not operate a motor vehicle for work.

(Tr. 76.) The VE explained that an individual so limited could work as an inspector, a linen grader, and a marker. (Tr. 77.)

The ALJ later adopted the following RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can never climb ladders, ropes, or scaffolds. He can never work at unprotected heights and never operate a motor vehicle, and *other seizure precautions as recommended by the claimant's treating physicians*.

(Tr. 34-35 (emphasis added).) The ALJ also found that an individual so limited could work as an inspector, a linen grader, and a marker. (Tr. 45-46.)

Robert points to the emphasized language above ("other seizure precautions as recommended by the

claimant's treating physicians") and asserts that

> It is unclear what the ALJ meant by "other seizure precautions as recommended by claimant's treating physicians," as Plaintiff's treating physician has repeatedly endorsed the opinion that Plaintiff is unable to work due to his seizure disorder and related injuries. (R. 707; 835). This alone should require reversal or remand, as the ALJ's RFC was clearly unsupported by the evidence, and there is no evidence that the occupations listed would be available considering the "other seizure precautions" the ALJ envisioned. (R. 31-80).

Docket Entry 10 at 19.

It is true that an ALJ generally cannot rely on a VE's testimony in response to an *incomplete* hypothetical—*i.e.*, a hypothetical that *omits* functional limitations that are assessed in the RFC. *See Walker*, 889 F.2d at 50-51. Here, however, Robert has not identified any specific limitation that was *omitted* from the hypothetical. At most, Robert has identified language employed by the ALJ in the RFC that did not set forth a functional limitation.

In other words, there is no prejudicial error in the ALJ's omission of "other seizure precautions as recommended by the claimant's treating physicians" from his hypothetical to the VE. This is because *there are no specific seizure precautions in the record endorsed by any of Robert's treating physicians*. Despite that, the ALJ included both motor vehicle and height restrictions in his hypothetical to the VE and in the RFC. Consequently, there were no "other seizure precautions as recommended" by Robert's "treating physicians" to be incorporated into the RFC.

Beyond this, in limiting Robert's exposure to heights and driving (Tr. 35), the ALJ essentially adopted the seizure-related limitations prescribed by the non-examining state agency consultant, who on reconsideration noted that Robert had "some nocturnal episodes" of seizures that were "relatively well controlled" and then limited Robert's exposure to environmental hazards such as heights and machinery. (Tr. 115-16.) The jobs the VE and the ALJ identified involve neither heights nor moving machinery. (*See* Tr. 76-77); *see also* Inspector, 727.687-062, 1991 WL 679674 ("Moving Mech. Parts: Not Present - Activity or condition does not exist"); Linen Grader, 361.687-022, 1991 WL 672993 (same); Marker, 209.587-034, 1991 WL 671802 (same). Nor, for that matter, do they appear to expose the worker to any other kind of environmental hazard. *See id.* Thus, the ALJ presented the only seizure precautions found in the medical record to the VE (which were ultimately adopted in the RFC). There is no material error here. *See Sparkman v. Kijakazi*, No. CV 7:20-

155-KKC, 2022 WL 2110321, at *4 (E.D. Ky. June 10, 2022) ("Because inclusion of the limitations mentioned by [claimant] would not have affected the selection of at least the 'routing clerk' and 'price marker' jobs by the vocational expert, any error on the part of the ALJ was harmless, and the decision must be affirmed.").

For all these reasons, the omission of the language Robert focuses on from the ALJ's hypothetical to the VE had no impact on the outcome of this proceeding. *See Tanner v. Comm'r of Soc. Sec.*, 602 F. App'x 95, 101 (4th Cir. 2015) (unpublished) (noting that "the ALJ posed hypotheticals to the VE that set out all of [the claimant's] *credible* limitations") (emphasis added); *see also Reece v. Colvin*, No. 7:14-CV-428, 2016 WL 658999, at *2 (W.D. Va. Jan. 25, 2016) (finding "that the ALJ did pose proper hypothetical questions to the vocational expert that accounted for all of [the claimant's] credibly established limitations"); *Kyle G. v. Comm'r of Soc. Sec.*, No. C20-5099-BAT, 2020 WL 4463221, at *3 (W.D. Wash. Aug. 4, 2020) (finding no material error where "Dr. Zendler did not indicate that any workplace seizure precautions were required, other than not driving, and the ALJ included this limitation in the RFC and VE hypothetical").

Robert's argument to the contrary is unpersuasive. He points to two medical opinions from a treating physician (Dr. Dawson, discussed in detail above) that he "is unable to work due to his seizure disorder and related injuries." Docket Entry 10 at 19 (citing Tr. 707 (Dr. Dawson's 10/17/22 check box opinion); 835 (Dr. Dawson's 8/6/24 check box opinion)). Thus, Robert appears to be arguing that these opinions are the "other seizure precautions" endorsed by his treating physician that the ALJ incorporated by reference into the RFC, but which were omitted from the hypothetical to the VE. This, Robert suggests, undercuts the ALJ's step five finding.

But this is not so. Robert does not explain how being "unable to work" is a specific functional limitation. After all, statements that a claimant is unable to work are inherently neither valuable nor persuasive. *See* 20 C.F.R. §§ 404.1520b(c), 416.920b(c). The ALJ cannot have erred by failing to include such a limitation in his hypothetical to the VE. Second, even setting this reason entirely aside, the ALJ specially addressed these two opinions and found them unpersuasive. (Tr. 42-43.) The ALJ had no obligation to present this purported functional limitation to the VE where the ALJ found it lacked credibility. (Tr. 42-43.) For all of these reasons, Robert's objections are without merit.

## V. CONCLUSION

After careful consideration of the evidence of record, the Court finds that the Commissioner's decision is legally correct, supported by substantial evidence, and susceptible to judicial review.

Accordingly, **IT IS HEREBY ORDERED** that the final decision of the Commissioner is upheld.

JoAnna Gibson McFadden
United States Magistrate Judge

August 19, 2026